## DI GIORGIO FRUIT CORP. et al. v. NATIONAL LABOR RELATIONS BOARD et al.

### No. 10605.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 16, 1950.

Decided June 21, 1951.
Writ of Certiorari Denied Nov. 5, 1951.
See 72 S.Ct. 110.

Mr. Marion B. Plant, San Francisco, Cal., with whom Mr. Alvin J. Rockwell, Washington, D. C., was on the brief, for petitioners.

Mr. Paul S. Kuelthau, Attorney, National Labor Relations Board, Washington, D. C., of the Bar of the Supreme Court of Wisconsin, pro hac vice, by special leave of Court, with whom Mr. A. Norman Somers, Asst. General Counsel, and Mr. Bernard Dunau, Attorney, National Labor Relations Board, Washington, D. C., were on the brief, for respondent National Labor Relations Board.

Messrs. Karl D. Loos and John F. Donelan, Washington, D. C., filed briefs as amici curiae on behalf of the Agricultural Producers Labor Committee, Western Growers Association and California Grape and Tree Fruit League, and on behalf of the Agricultural Council of California, urging reversal.

Miss Kathryn Casey, Washington, D. C., filed a brief as amicus curiae on behalf of the International Apple Association, urging reversal.

Messrs. Eugene O'Dunne, Jr., and John Ward Cutler, Washington, D. C., filed a brief as amici curiae on behalf of the National Potato Council and United Fresh Fruit and Vegetable Association, urging reversal.

Before WILBUR K. MILLER, PRETTYMAN and WASHINGTON, Circuit Judges.

PRETTYMAN, Circuit Judge.

This case is before us upon a petition for review of an order of the National Labor Relations Board, which dismissed a complaint, issued by the General Counsel of the Board, charging two unions with unfair practices under the so-called secondary boycott provision of the National Labor Relations Act.[1] The petitioners are the Di Giorgio Fruit Corporation, engaged in growing and selling vegetables and fruits, and its wholly owned subsidiary, the Di Giorgio Wine Company. The full name of the union which we shall call the "Farm Union" is Kern County Farm Labor Union, Local 218, National Farm Labor Union. The full name of the union which we shall call "Teamsters 87" is International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 87. Four unions were charged in the complaint, but the Board granted relief against two of them, and they are not involved in this review.

The Farm Union is composed of harvest and field workers, irrigators, and packing shed workers, all of whom are employed by the Fruit Corporation as agricultural laborers. It is the Kern County Local of the National Farm Labor Union, the members of which National are in part agricultural laborers and in part commercial

packing house employees and others. The membership of Teamsters 87 is composed of truck drivers and helpers employed by trucking and other concerns in the area.

The controversy began when the two unions demanded that the Fruit Corporation bargain collectively with them as representatives of units of workers in its employ. That demand was rejected. Thereupon the workers commenced a strike. A joint picket line was established at each point where a private road from the Fruit Corporation property joined a public road. As the result of certain events, detailed hereinafter, the petitioners filed charges against the unions, and the General Counsel of the Board thereupon issued a complaint which charged, so far as here pertinent, that the unions had engaged in and were engaging in unfair labor practices within the meaning of Section 8 of the Act[2] and, more particularly, that they had engaged in a secondary boycott.

Section 8(b) (4) (A) of the Act reads as follows, so far as here pertinent:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

    *    *    *    *    *    *

"(4) * * * to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to * * * transport, or otherwise handle or work on any * * * commodities or to perform any services, where an object thereof is: (A) forcing or requiring * * * any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; * * *."

From this point on, this consideration is really in two separate parts, one relating to the Farm Union and the other relat-

---

1. Sec. 8(b) (4) (A) of the National Labor Relations Act as amended by Sec. 101 of the Labor Management Relations Act, 1947, 61 Stat. 140, 29 U.S.C.A. § 158(b) (4) (A).

2. For brevity we shall use merely the word "Act", without further citation, to refer to the National Labor Relations Act as amended by the Labor Management Relations Act, 1947, 61 Stat. 136 et seq., 29 U.S.C.A. § 151 et seq.

ing to Teamsters 87. We shall treat it that way.

*Farm Union.*

On several occasions during the strike, members of the Farm Union followed truckloads of produce or cars of wine from the Di Giorgio property to the plants of the purchasers and there established picket lines. Employees of the purchasers declined to cross these picket lines. The Board did not reach the question whether these activities constituted a secondary boycott. It held that the statute did not apply to the Farm Union.

The first consideration upon this point is quite simple, a matter of statutory language. The statute, as will be noted from the above quotation, relates to an unfair labor practice of "a labor organization or it agents". That is, the only unfair labor practices to which the statute applies are such practices of "a labor organization or its agents".

Section 2 of the Act contains statutory definitions. It provides, among other things:

"Sec. 2. When used in this Act—

\* \* \* \* \* \*

"(3) The term 'employee' shall include any employee, \* \* \* but shall not include any individual employed as an agricultural laborer, \* \* \*.

\* \* \* \* \* \*

"(5) The term 'labor organization' means any organization of any kind \* \* \* in which employees participate \* \* \*."

Thus, according to the language of the Act, "employees" must participate in an organization if it is to be deemed a labor organization within the meaning of the statute, and agricultural laborers are not included within the statutory term "employees". Hence, so far as the words of the statute are concerned, the Farm Union, being composed exclusively of agricultural laborers, is not a labor organization within the meaning of the statute, and so a

secondary boycott by the Farm Union would not fall within the prohibitions of the statute.

But the argument leads into the intricacies of legislative meaning despite the words used. Petitioners say that in defining the term "labor organization" Congress did not use the word "employees" in its defined sense but used it in a generic sense, meaning all persons who are employed. They find support for their contention in two propositions: (1) that a prime objective of Congress in enacting the secondary boycott provision was the protection of farmers; and (2) that the Supreme Court held in Phelps Dodge Corp. v. National Labor Relations Board [3] that "employee" was not used in its defined sense in all provisions of the statute.

Petitioners have a powerful argument in their contention that in enacting the secondary boycott provision Congress was concerned with the plight of farmers. They refer to the two opening statements in support of the bill when it reached the floor of the House.[4] Both of those statements illustrated the necessity for the proposed provisions by referring to damages caused to farmers. Moreover, the legislative history of Section 303 of the Labor Management Relations Act, 1947,[5] seems to support that view. That section gives a person injured in his business or property by reason of a secondary boycott the right to sue for damages. The section was inserted in the Senate after the bill had been reported from the Committee, and the supplemental report upon the proposed amendment emphasized the predicament of the farmer.[6] The amendment was first proposed by Senator Ball, and in explaining it on the Senate floor he said: "\* \* \* As I said before, farm producers and small businesses and their employees are the main victims of secondary boycotts, jurisdictional strikes, and organizational boycotts. \* \* \* It is such persons and their rights that we are trying to protect."[7]

3. 1941, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271.

4. 93 Cong.Rec. 3424, 3432 (1947).

5. 61 Stat. 158, 29 U.S.C.A. § 187.

6. Sen.Rep.No.105, 80th Cong., 1st Sess. 54 (1947).

7. 93 Cong.Rec. 4838 (1947).

The Ball Amendment having been defeated because of an objection to provisions for injunctive relief, Senator Taft offered an amendment in which the objectionable provisions were omitted. As thus presented to the Senate, the amendment would have declared it unlawful for "any person" to engage in a secondary boycott. During the course of the debate an objection was made that the phrase "any person" would impose the liability upon individuals. Senator Taft therefore amended the proposal to substitute "labor organization" for person. He said: " * * * I shall make one change. The word 'person' in line 2 will be changed to read 'labor organization,' so that suits in secondary boycotts may be brought only against labor organizations and not against individuals, which might have been the effect, as stated by the Senator from New York."[8] By this change Section 303 became identical in its pertinent phraseology with Section 8(b), but there is certainly no indication that by the change it was intended to deprive farmers of any portion of their protection against secondary boycotts. Thus, petitioners have strong support for their contention in this respect. At the same time, it must be pointed out that, as the effect of secondary boycotts upon farmers was discussed in Congress, the references were to the difficulties caused by the activities of teamsters, longshoremen, etc., and not to possible activities of agricultural workers. Thus Senator Taft said: "The trouble is that the man drives up to the delivery point, and because the teamsters' union says he does not have a teamster's card, then the union in the plant, the unloaders, or longshoremen, or whatever they may be, will not unload his truck. That is what we are trying to reach in this case."[9] In this connection reference should also be made to the hearings before the House and Senate Committees, in which the difficulties of farmers with boycotts were discussed.[10]

They show that Congress was concerned with the activities of unions other than those consisting of agricultural workers, and did not specifically consider the latter group in this regard. The statute unquestionably protects farmers from secondary boycotts by organizations in which teamsters, etc., not classified as agricultural workers, participate. But that is not the question now before us.

This brings us to petitioners' reliance upon Phelps Dodge Corp. v. National Labor Relations Board, supra. We think that opinion does not determine the problem now before us. That case concerned the power of the Labor Board to order reinstatement where it had been determined that strikers were denied reemployment because of union activities. Section 10(c) of the Act provides that the Board, upon proper findings, may issue an order requiring "reinstatement of employees". [313 U.S. 177, 61 S.Ct. 849.] Section 2(3) of the Act, from which we have already quoted in part, provides that "The term 'employee' * * * shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment * * *." There was some doubt in the evidence as to whether some of the workers involved had or had not obtained "substantially equivalent employment". The contention was made that workers who had obtained other regular and substantially equivalent employment could not be reinstated by the Board, since they were not "employees" by statutory definition. The Supreme Court referred to the word "employees" in the reinstatement provision and to the statutory definition of "employee". It said: "The syllogism is perfect. But this is a bit of verbal logic from which the meaning of

8. 93 Cong.Rec. 4843 (1947).

9. 93 Cong.Rec. 4867 (1947).

10. Hearings before House Committee on Education and Labor on Amendments to the National Labor Relations Act, 80th Cong., 1st Sess. 719, 724, 1803, 1840 et seq., 1890 et seq., 1912 et seq. (1947); Hearings before Senate Committee on Labor and Public Welfare on Labor Relations Program, 80th Cong., 1st Sess. 494 et seq., 1636 et seq., 1644 et seq. (1947).

things has evaporated."[11] It pointed out that in the reinstatement provision "the reference is to 'employees,' unqualified and undifferentiated." Then it said: "To circumscribe the general class, 'employees,' we must find authority either in the policy of the Act or in some specific delimiting provision of it." The Court pointed to the generality of the opening phrase of the definition of "employee", which reads: "The term 'employee' shall include any employee". The Court held that the subsequent clause "who has not obtained any other regular and substantially equivalent employment" was not intended to be destructive of the broad definition with which the section begins. But it does not seem to us that the same process of reasoning applies to the problem now before us. In the first place, it seems to us that the clause, in the statutory definition, "but shall not include any individual employed as an agricultural laborer" is a "specific delimiting provision". Such a provision, the Court indicated, does "circumscribe the general class, 'employees'". Moreover, our problem relates to two paragraphs in the same section of the statute, not to two different sections dealing with different topics. Paragraph (3) of Section 2 defines the term "employee", and paragraph (5) of the same section defines the term "labor organization", using the word "employees". In that situation there is little or no room to examine questions of policy, which were pertinent to the consideration by the Supreme Court of the intended scope and meaning of an entire section of the Act (Section 10), relating to the prevention of unfair labor practices and including as a major part an important and controversial policy as to the power to order the reinstatement of striking employees. Similar questions of policy might arise if we were to attempt to derive the meaning of the term "labor organization" as it appears in Section 8(b), but it seems to us that if we should depart from the statutory definition of that term as it appears in the vital provisions of Section 8(a) and 8(b), giving it a defined meaning at some

points and an undefined meaning at others, we would simply be rewriting the statute.

It seems clear from the legislative history, as the Board says, that Congress meant to exclude agricultural laborers from the provisions of the Act. The Senate Report on the bill which became the original National Labor Relations Act,[12] says that "For administrative reasons, the committee deemed it wise not to include under the bill agricultural laborers, persons in domestic service of any family or person in his home, or any individual employed by his parent or spouse." The Board also supports its view by an analogy to the exclusion of railroad workers from the definition of "employees". Section 2(3) of the Act, which we have quoted in part above, provides that "The term 'employee' * * * shall not include * * * any individual employed by an employer subject to the Railway Labor Act * * *." That provision was inserted in 1947, and the Senate Report upon that bill stated: "The exemption of employees of employers subject to the Railway Labor Act is to make it perfectly clear that in providing remedies for unfair labor practices of unions and their agents it was not intended to include such employees."[13]

The Board reasons that if, in order to make it perfectly clear that the remedies for unfair labor practices did not apply to railway employees, Congress excluded such employees from the statutory definition of the term "employee", it follows that the exclusion of agricultural laborers from the statutory definition of "employee" was intended to have the same result. In short, the Board says that Congress devised the statutory definitions for the express purpose of delimiting the scope of the Act.

Section 8(b) of the Act, from which we have quoted in part, and which makes illegal an unfair labor practice of a labor organization, includes not merely the clause relating to secondary boycotts but contains six paragraphs dealing with other practices or acts. These other paragraphs do not

11. Supra at 313 U.S. 191, 61 S.Ct. 851, 85 L.Ed. 1271.

12. Sen.Rep.No.573, 74th Cong., 1st Sess. 7 (1935).

13. Sen.Rep.No. 105, 80th Cong., 1st Sess. 19 (1947).

seem to refer to organizations of agricultural laborers. The Board says that this meaning is obvious because, if these other paragraphs were applicable to organizations of agricultural laborers, the exclusion of such laborers from the definition of "employee" would be completely wiped out. Thus, for example, the first paragraph declares that it shall be an unfair labor practice for a labor organization to restrain or coerce employees from the exercise of the rights guaranteed in Section 7 of the Act, and Section 7 is the section which declares that "Employees shall have the right to  *  *  * bargain collectively through representatives of their own choosing". The incongruity and conflict resulting from giving the term "employees" its statutory defined meaning, excluding agricultural employees, but at the same time giving the term "labor organization" a non-statutory meaning so as to include agricultural laborers throughout Section 8(b), is emphasized by the Board. Moreover, the Board points out that Section 8(a), which makes illegal an unfair practice by employers, and thus bestows rights and benefits on employees, uses the term "labor organization" throughout. We think that the section conferring benefits, Section 8(a), and the section imposing restrictions, Section 8(b), which are subdivisions of the same section of the Act, must be construed in harmony; and that, if they be construed to apply to organizations of agricultural laborers, they would nullify the exclusion of such laborers from the statutory definition of "employees".

■ As we have said in other similar cases, the problem here presented to us is essentially a legislative problem. Congress was undoubtedly concerned with the plight in which secondary boycotts place farmers; and it effectively protected farmers from the sort of boycotts which it then had in mind, boycotts by teamsters, unloaders, etc. At the same time, it seems indisputably clear that Congress did not intend to include within either the benefits or the restrictions of the Act organizations composed exclusively of agricultural laborers. There is nothing to tell us whether, if Congress had noted the problem of secondary boycotts against farmers by organizations of agricultural laborers, it would have decided it according to its policy in respect to agricultural laborers or would have decided it in accordance with its policy in respect to the protection of farmers. Congress did not in terms make such a boycott an unfair labor practice within the meaning of the statute and thus subject to the statutory limitations and processes. Under those circumstances, we think that the proper function of the courts is to abide by the terms used by the Congress. The problem can readily be presented again to the Congress for its determination. The ultimate problem whether secondary boycotts by agricultural laborers should be forbidden is for the Congress and not for the courts. We cannot decide what ought to be done in such a matter; our function is merely to ascertain what Congress has already done.

One more point concerning the Farm Union must be considered. Petitioners say that even if the Farm Union is not itself a labor organization it is the agent of a labor organization, the National Farm Labor Union. The National Union is a labor organization within the meaning of the Act; it includes as members workers other than agricultural laborers. A western representative of the National, a member of its executive board, helped organize the Farm Union, and an organizer employed by the National was sent to the area to help the Farm Union run its strike. The Board found nothing in the record to indicate that the Farm Union was acting as an agent of the National within the meaning of the statute.

■ The constitution of the National Union shows that the basic unit in the organization is the local. Each local has its own offices and its own executive committee. The supreme governing body of the National is a convention composed of delegates elected by the locals. Initiation fees and dues are collected by the local, and designated portions of such collections are forwarded to the National. The locals enter into collective bargaining, and contracts negotiated by their representatives are submitted to the "vote of the membership affected by the contract" and, when

approved, are signed by the locals. The constitution (Article X, Section 3) provides that when a dispute arises with an employer all resources must be exhausted by the local; that when the local finds it impossible to settle differences the local officers shall notify the president of the National, who shall send a National representative to seek a settlement; that if he is unable to settle the matter a meeting of the local, or the involved portion of the local, shall be called and, if two-thirds of the members affected vote to strike, the members are authorized to stop work, set up picket lines, and take other action necessary to call attention of the public to the issues involved. All those provisions spell out a basic responsibility on the part of the local rather than a subordinate position of agency delegated by the National. The presence of the two National representatives assisting the local Farm Union in the course of the strike was not sufficient to constitute the local an agent of the National. If, on the evidence here presented, it were to be held that this local was the agent of the National, it would be difficult to imagine a local member of the National which would not be such an agent. Thus the considerations which we have described, and which lead us to the conclusion that organizations composed exclusively of agricultural workers are not included in the Act, would be largely vitiated. We agree with the Board on this point.

■ One further argument submitted by *amici curiae* should be noted. Section 2(3) of the Act, in defining "employee", provides that the term shall include "any individual whose work has ceased as a consequence of * * * any current labor dispute" but shall not include "any individual employed as an agricultural laborer". The contention is that those provisions mean that while the strikers were employed as agricultural laborers they were not included as employees under the Act, but that when they ceased to work as the result of the labor dispute they placed themselves within the terms of the Act. This somewhat contradictory construction finds solid basis, *amici* say, in the intent of the Act. That intent, they say, was to prevent the obstruction of interstate commerce; so, they say, although Congress did not intend the general provisions of the statute to apply to agricultural laborers in ordinary course, it did intend that the prohibitive provisions of the statute should apply to any person whose activity might obstruct commerce; therefore the Act applies to all persons, including agricultural workers, who have ceased work and are engaged in activities obstructive of commerce. The argument represents a supportable view which would be valid as a legislative policy and valid if incorporated in a statute, but we do not find in this statute or in its legislative history any indications that it was a policy which motivated Congress when the statute was enacted. The essence of the construction urged—that while at work these laborers are not employees but when not at work they are employees—is too contradictory of terms to be adopted without some compelling evidence of that meaning. For us to write that view into the present law would be to add something of major import which we cannot find already there.

In the light of all the foregoing considerations, we conclude that the order of the Board in respect to the Farm Union should be affirmed. We think that its reasoning and conclusions in respect to the meaning of the statute, as it relates to agricultural laborers, were correct.

*Teamsters 87.*

The problem as to Teamsters 87 is wholly different from that relating to the Farm Union. The activities of the Teamsters were confined to the entrances to the Di Giorgio property. There, as we have already said, Teamsters 87 and the Farm Union had established a joint picket line. When trucks belonging to various trucking concerns drove up to the picket line with goods or produce, they were halted and the pickets endeavored to persuade them not to cross the line. The picketing was entirely peaceable. In some instances teamsters who nevertheless crossed the picket line were subjected to disciplinary proceedings in their union. Petitioners say that these activities of Teamsters 87 were, beyond any question, for the purpose of inducing employees of other employers to

refrain from transporting goods, with the object of forcing those employers to cease transporting the products of Di Giorgio, and thus, they say, were clearly violative of the statute. Teamsters 87 is, it is agreed, a labor organization and subject to the prescriptions of the Act.

The Board says that the provisions of the statute (Section 8(b) (4) (A)) relate to secondary boycotts only and do not apply to activities of pickets at the place of their own employment where they are using the picket line to enforce their right to strike against their own employer. Such picketing activity is called a primary activity in the language of labor law. The Board says that the activities of Teamsters 87 were directed solely toward maintaining the observance of its primary picket line established at the premises of Di Giorgio, and thus do not fall within the ban against secondary activity. This court recognized and sustained the distinction between primary and secondary action in Denver Bldg. and Const. Tr. Council v. National Labor Rel. Bd.[14] That distinction was not disturbed by the Supreme Court in its opinion reversing the decision of this court in that case,[15] but on the contrary was recognized and affirmed in the International Rice Milling Company case[16] and in the Court's reference to the Denver case in the International Brotherhood of Electrical Workers case.[17] As the two are thus distinguished, we agree with the Board that the activities of Teamsters 87 in this case were a primary activity and not forbidden by the statute.

The order of the Board should be and is affirmed.

WILBUR K. MILLER, Circuit Judge (dissenting in part and concurring in part).

I dissent from that portion of the majority opinion which upholds the Labor Board's decision in favor of the Farm Union. My reasons are these:

By the terms of the Act, it is an unfair practice for a labor organization or its agents to engage in secondary boycotts. The Farm Union, acting as agent for the National Farm Labor Union, which is a labor organization within the meaning of the statute, engaged in such boycotts. The Farm Union was therefore guilty of the unfair labor practices charged against it by the General Counsel of the Labor Board.

To test the foregoing statements, let us first see what the Farm Union did. The majority opinion correctly states that "On several occasions during the strike, members of the Farm Union followed truckloads of produce or cars of wine from the Di Giorgio property to the plants of the purchasers and there established picket lines. Employees of the purchasers declined to cross these picket lines." Such activities clearly constituted secondary boycotts. National Labor Relations Board v. Denver Building & Const. Trades Council, 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284. The Farm Union is guilty, then, of unfair labor practices unless, when it established such boycotts it was neither a labor organization in the statutory sense, nor acting as agent for that type of organization.

The Labor Board decided that the Farm Union, being composed exclusively of agricultural laborers, was not a labor organization within the meaning of the statute. I think, for the reasons advanced in argument by the petitioner and *amici curiae* —which are summarized in the majority opinion—that the Farm Union should be regarded as the type of union to which the Act applies.

Be that as it may, however, it is my view that the Farm Union acted as agent for what was undoubtedly a labor organization

14. 1950, 87 U.S.App.D.C. 293, 186 F.2d 326.

15. National Labor Relations Board v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284.

16. National Labor Relations Board v. International Rice Milling Co., Inc., 1951, 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277.

17. International Brotherhood of Electrical Workers, Local 501, A. F. of L. v. National Labor Relations Board, 1951, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299.

when it established secondary boycotts, and that therefore it engaged in unfair labor practices. The National Farm Labor Union, of which the Farm Union is a "local," is a labor organization under the statutory definition of that term. It is not composed exclusively of agricultural laborers. Indeed, the Labor Board itself has expressly held the National Farm Labor Union to be such an organization. Barr Packing Company, 82 N.L.R.B. 1, 9 (1949). So the question before us boils down to whether the Board correctly held, as a matter of law, that the local union was not acting as agent for its parent in establishing secondary boycotts.

The Labor Board held the local was not acting in the role of agent "because it acted in its own interest." No other basis for the holding was given. That amounts to saying, as a legal proposition, that an agent's act in furtherance of its principal's purposes cannot be the act of the principal if it simultaneously serves to further some personal purpose of the agent. The mere statement of such a proposition is enough to refute it, but authority is available to show that the law is otherwise. Restatement, Agency § 236, comment (b); Hooper-Holmes Bureau v. Bunn, 5 Cir., 1947, 161 F.2d 102; National Battery Co. v. Levy, 8 Cir., 1942, 126 F.2d 33, certiorari denied 1942, 316 U.S. 697, 62 S.Ct. 1294, 86 L.Ed. 1767; Thomas v. Slavens, 8 Cir., 1935, 78 F.2d 144.[1] Moreover, the Labor Board's statement quoted above is refuted by one of its own prior rulings. The Board itself has attributed unlawful activity to a parent union because its local engaged in that activity to achieve a purpose common to both. That is to say, the Labor Board has recognized, contrary to its ruling in this case, that strike action by a local may well be equally in the interest of the parent union. International Longshoremen's and Warehousemen's Union, 79 N.L.R.B. 1487, 1514 (1948).

With the Labor Board's erroneous statement of principle out of the way, I turn to the factual situation to see if the Farm Union was, in fact and in law, acting as agent for its parent in establishing a secondary boycott. It should be noted at the outset that the statute says authorization and ratification are not to be controlling in ascertaining whether agency exists. 29 U.S.C. § 152(13).[2]

I need go no further than the majority opinion to find a statement of facts from which the agency of the local clearly flows. I quote from it: "* * * A western representative of the National, a member of its executive board, helped organize the Farm Union, and an organizer employed by the National was sent to the area to help the Farm Union run its strike."

The Farm Union was a newly organized body which had not been recognized by Di Giorgio, the employer of all of its members. The purpose of the strike was to force recognition. Establishment of secondary boycotts was a part of the strike activity and was therefore designed to effect recognition. Organizing a local union is rather futile unless it is recognized by the employer of its members, and in a very real sense organization is not complete until that goal is reached.

What was the purpose of the National Union in sending one of its officers to the scene? It was, as the majority say, to help organize the Farm Union. Obviously to help it attain recognition was a part of that purpose. Why did the National Union desire to aid in organizing the local and in obtaining recognition for it? There can be but one answer: because it wanted to increase its own membership and to expand its own influence in the California farm labor field.

"* * * [A]n organizer employed by the National was sent to the area to help the Farm Union run its strike", say the majority. Why did the National Union do that? Because its purpose was to complete the organization of the new local by helping it to attain recognition. Why was an

---

1. The Hooper-Holmes, National Battery and Thomas cases dealt with the master and servant relation, but the principle in the agency relation is the same. Cf.

Park Transfer Co. v. Lumbermens Mut. Casualty Co., 1944, 79 U.S.App.D.C. 48, 142 F.2d 100.

2. 29 U.S.C.A. § 152(13).

"organizer" sent? Because the process of organization was still going on, and the strike was thought necessary to complete the process by forcing Di Giorgio to recognize the new local. Thus the strike and the attendant boycotts were steps in reaching the objective of the National Farm Labor Union. In these circumstances it seems idle to say the local was not acting as agent for the National. There was the organizer "to help the Farm Union to run its strike." The principal was assisting its agent.

In face of all this the majority opinion says, " * * * The Board found nothing in the record to indicate that the Farm Union was acting as an agent of the National within the meaning of the statute",
and adds, "We agree with the Board on this point."

My brothers' agreement with the Board is based upon their analysis of the National Union's constitution, from which they draw the following conclusion: " * * * All those provisions spell out a basic responsibility on the part of the local rather than a subordinate position of agency delegated by the National."

The statement just quoted from the majority opinion is, in my view, a restatement of the Labor Board's erroneous conclusion that the Farm Union was not acting as agent for the National "because it acted in its own interest." The fact that the local union could initiate and carry on a strike on its own "basic responsibility" in order to achieve a purpose in which the National had no interest, does not prevent the conclusion, which I think is inevitable, that here the Farm Union acted not only for itself but for the parent union as well, and that the result sought was one in which the National Union was deeply interested.

For these reasons I think the facts of the case compel the conclusion that the Farm Union acted as agent for the National in setting up secondary boycotts and was therefore guilty of the unfair labor practices which were charged against it.

The Labor Board also found Teamsters 87 not guilty of unfair labor practices, although it held that union to be a labor organization within the statutory definition. The Labor Board said Teamsters' activities were primary and so were not within § 8(b)(4) of the Act. The majority opinion affirms the Labor Board in this decision, and I concur for the reason hereinafter given.

The Act does not use the terms "primary" or "secondary" but provides in plain terms that it shall be an unfair labor practice for a union "(4) to engage in, or to induce or encourage the employees of any employer to engage in * * * a concerted refusal in the course of their employment to * * * transport * * * any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer * * * to cease doing business with any other person * * *." (29 U.S.C. § 158(b) ).[3]

Teamsters 87 induced and encouraged certain employees of four trucking concerns to refuse to transport goods and to perform service in the course of their employment, the object thereof being to force and require those trucking concerns to cease doing business with Di Giorgio.

The only thing that saves Teamsters 87 from being guilty of a statutory unfair labor practice is the presence of the word "concerted" in the second line of § 8(b)(4). The union's conduct fits perfectly into the statutory language except that it may be doubted whether the refusal to transport goods to Di Giorgio, which Teamsters 87 induced and encouraged, was a "concerted" refusal of which the statute speaks. This is the distinction upon which the Supreme Court relied in National Labor Relations Board v. International Rice Milling Co., 1951, 341 U.S. 665, 71 S.Ct. 961, 962, 95 L. Ed. 1277, to support its holding that the union pickets did not violate § 8(b) (4) when " * * * In the course of their picketing, the agents sought to influence, or in the language of the statute they 'en-

---

3. 29 U.S.C.A. § 158(b) (4).

couraged,' two men in charge of a truck of a neutral customer of the mill to refuse, in the course of their employment, to go to the mill for an order of goods."

. Being bound by this construction of § 8(b)(4), I concur in that portion of the majority opinion which affirms the Labor Board's finding in favor of Teamsters 87.