**HAWAII GOVERNMENT EMPLOYEES ASSOCIATION, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, LOCAL 152, Appellant,**

v.

**Salvatore R. MARTOCHE, Individually and as Assistant Secretary for Labor-Management Standards, United States Department of Labor, Appellee.**

No. 88-5057.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 10, 1989.

Decided Oct. 2, 1990.

Craig Becker, San Francisco, Cal., with whom Larry Weinberg, Washington, D.C., was on the brief, for appellant.

George P. Williams, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before EDWARDS and SENTELLE, Circuit Judges, and ROBINSON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Senior Circuit Judge:

Local 152 of the Hawaii Government Employees Association represents a number of state and local-government employees in labor matters. It attacks the Secretary of Labor's position[1] that over a two-year period in the 1980's it was a "labor organization" within the contemplation of the Labor Management Reporting and Disclosure Act.[2] On stipulated facts, the District Court granted summary judgment for the Secretary.[3] For reasons following, we affirm.

## I. BACKGROUND

The Act imposes fiduciary, reporting and disclosure obligations on labor organizations, their officers and employees.[4] It authorizes the Secretary to conduct investigations to ascertain whether the Act's provisions are being observed,[5] and, in that connection to subpoena records from the labor group under investigation.[6] The Act so defines "labor organization" as to exclude "a State or local central body," but to encompass almost every other type of employee group "which exists for the purpose, in whole or in part, of dealing with employers concerning" labor matters.[7] The Act defines "employer" just as broadly,[8] but that term does not include "the United States or any corporation wholly owned by the Government of the United States or any State or political subdivision thereof."[9] Accordingly, labor organizations represent-

---

1. The Secretary has, of course, delegated many powers and assigned many responsibilities to subordinates in the Department of Labor. For convenience, we refer to the Secretary irrespective of who in the Department had been the actor.

2. Pub.L. No. 86–257, 73 Stat. 519 (1959) (codified at 29 U.S.C. §§ 401–531 (1988)) [hereinafter cited as codified].

3. *Hawaii Gov't Employees Ass'n, Local 152 v. Martoche*, Civ. No. 87–502 (1988 WL 8270) (D.D.C. Jan. 22, 1988) (memorandum and order), Joint Appendix (J.App.) 36–41.

4. E.g., 29 U.S.C. §§ 431, 432, 501 (1988).

5. *Id.* § 521(a).

6. *Id.* § 521(b) (incorporating provisions of 15 U.S.C. §§ 49, 50 (1988)).

7. "'Labor organization' means a labor organization engaged in an industry affecting commerce and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms and conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization, other than a State or local central body." 29 U.S.C. § 402(i) (1988).

8. "'Employer' means any employer or any group or association of employers engaged in an industry affecting commerce (1) which is, with respect to employees engaged in an industry affecting commerce, an employer within the meaning of any law of the United States relating to the employment of any employees or (2) which may deal with any labor organization concerning grievances, labor disputes, wages, rates of pay, hours of employment or conditions of work, and includes any person acting directly or indirectly as an employer or as an agent of an employer in relation to an employee but does not include the United States or any corporation wholly owned by the Government of the United States or any corporation wholly owned by the Government of the United States or any State or political subdivision thereof." *Id.* § 402(e).

9. *Id.*

ing employees of states or political subdivisions of states exclusively are not subject to the Act.[10]

In 1987, the Secretary served on Local 152 an administrative duces tecum demanding production of certain records from July 1, 1983, to June 30, 1985.[11] Local 152 refused to comply and sued in the District Court in an effort to quash the subpoena.[12] Its claim throughout this litigation has been that between those dates the only persons it represented were employees of the State of Hawaii or political subdivisions thereof, and thus that it was exempt from the Act's requirements.[13] As interpreted both administratively[14] and judicially,[15] however, the exemption is unavailable if the representation extends also to nongovernmental employees.[16] It is undisputed that from 1973 to June 3, 1985, Local 152 also represented employees of the Center for Cultural and Technical Interchange Between East and West,[17] which the Secretary says was not a political subdivision of any state.

Congress created the Center in 1960 to provide a place where scholars and students from nations of the East and the West might engage in study and interchange of ideas.[18] Hawaii incorporated the Center as a nonprofit educational organization in 1975.[19] In due course, we examine the characteristics of the Center in depth.[20] The District Court, concluding that the Center was not a political subdivision of a state, refused to quash the subpoena.[21] This appeal followed.

## II. LEGISLATIVE TREATMENT OF "POLITICAL SUBDIVISION"

In reviewing an interpretation of a statute by an officer or agency entrusted with its administration, we must adhere to principles adumbrated in a series of Supreme Court decisions beginning with *Chevron U.S.A. Inc. v. NRDC.*[22] First, using the "traditional tools of statutory construction,"[23] we must determine "whether Con-

---

10. The parties concur in this construction. See Joint Statement of Uncontested Material Facts, *Hawaii Gov't Employees Ass'n, Local 152 v. Martoche,* Civ. No. 87–502 (D.D.C.) (filed May 20, 1987) [hereinafter Statement of Facts] ¶ 7, J.App. 6. See also *Di Giorgio Fruit Corp. v. NLRB,* 89 U.S.App.D.C. 155, 191 F.2d 642, *cert. denied,* 342 U.S. 869, 72 S.Ct. 110, 96 L.Ed. 653 (1951) (construing National Labor Relations Act's exclusion of agricultural workers from coverage).

11. Statement of Facts, *supra* note 10, ¶¶ 1–3, J.App. 5. See also J.App. 20–22.

12. *Hawaii Gov't Employees Ass'n, Local 152 v. Martoche,* Civ. No. 87–502 (D.D.C.) (filed Feb. 26, 1987).

13. See Brief for Appellant at 6–7. See also 29 C.F.R. § 451.3(a)(4) (1989) (generally, unions representing governmental employees exclusively are not covered by the Act); *Crilly v. Southeastern Pa. Transp. Auth.,* 529 F.2d 1355, 1359–1363 (3d Cir.1976) (district courts proceeding under the Act lack subject-matter jurisdiction over political subdivisions); *Local 1498, AFGE v. AFGE,* 522 F.2d 486, 490 (3d Cir.1975) (same); *City of Saginaw v. Service Employees Int'l Union, Local 446–M,* 720 F.2d 459, 462 (6th Cir. 1983) (same); *Ayres v. IBEW,* 666 F.2d 441, 442–444 (9th Cir.1982) (same).

14. E.g., 29 C.F.R. § 451.3(a)(4) (1989) (unions representing mixture of governmental and non-

governmental employees are covered by the Act).

15. E.g., *Hester v. International Union of Operating Eng'rs,* 818 F.2d 1537, 1541 (11th Cir.1987) (organization representing private-sector as well as Tennessee Valley Authority employees subject to the Act), *judgment vacated on other grounds,* 488 U.S. 1025, 109 S.Ct. 831, 102 L.Ed.2d 963 (1989).

16. Neither party contests this proposition.

17. Statement of Facts, *supra* note 10, ¶¶ 11, 39–40, 43.

18. Center for Cultural and Technical Interchange Between East and West Act of 1960, Pub.L. No. 86–472, § 702, 74 Stat. 141 (1960) (codified at 22 U.S.C. § 2054 (1988)) [hereinafter cited as codified].

19. East–West Center Corporation Act, 1975 Haw.Sess.Laws 82.

20. Part IV *infra.*

21. *Hawaii Gov't Employees Ass'n, Local 152 v. Martoche, supra* note 3, at 5, J.App. 40.

22. 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

23. *Id.* at 843 n. 9, 104 S.Ct. at 2781–2782 n. 9, 81 L.Ed.2d at 703 n. 9. See also *NLRB v. United Food & Commercial Workers Union,* 484 U.S.

gress has directly spoken to the precise question at issue," [24] and if so we must, of course, rule consistently with that intent.[25] If, on the other hand, legislative intent is obscure or lacking, we must defer to the agency's interpretation unless it is unreasonable.[26]

While, as we have noted, the Act defines "employer" and "labor organization" and "employer" expansively,[27] it does not define the term "political subdivision" nor, beyond what those two words naturally suggest, does it furnish any clue to what a "political subdivision of a state" really is. Further complicating the problem is the sparsity of legislative history on this point. The House Report merely restated the language of its bill.[28] The Senate Report simply observed that its version "define[d] 'labor organization' in the same terms as does the National Labor Relations Act, as amended," but gave it greater scope "since the definitions of 'employer' and 'employee' which are used in defining the term do not contain any of the exclusions, such as those for employers and employees subject to the Railway Labor Act, employers of agricultural labor, employers of public employees (except as provided in subsection (d)), which are provided for in the act." [29] The Conference Report added nothing.[30]

With some imprecision in the statutory text and a nearly total lack of elucidation in the legislative history, the situation is squarely one in which Congress implicitly "left a gap for the agency to fill" [31] when that becomes necessary in close cases, and therefore one in which "a court may not substitute its own construction of [the] statutory provision for a reasonable interpretation made by the administrator of an agency." [32] We turn, then, to see what the Secretary had to say.

## III. ADMINISTRATIVE INTERPRETATION OF "POLITICAL SUBDIVISION"

While Congress left the purport of "political subdivision" somewhat in the dark, the Secretary has undertaken to illuminate the way out. In a manual interpreting the Act, the Secretary has declared:

Whether a particular entity is a 'political subdivision' of a State depends upon the facts of each case. Included among the factors that may be considered are the following: (1) whether the State or other public authority exercises any regulatory control over the entity; (2) whether the State or other political authority participates in the selection of officers of the entity; (3) whether the operations of the

112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429, 441–442 (1987); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 447–448 & n. 29, 107 S.Ct. 1207, 1220–1221 & n. 29, 94 L.Ed.2d 434, 456–457 & n. 29 (1987).

**24.** *Chevron U.S.A. Inc. v. NRDC, supra* note 22, 467 U.S. at 842, 104 S.Ct. at 2781, 81 L.Ed.2d at 702–703. See also *NLRB v. United Food & Commercial Workers Union, supra* note 23, 484 U.S. at 123, 108 S.Ct. at 421, 98 L.Ed.2d at 441; *INS v. Cardoza–Fonseca, supra* note 23, 480 U.S. at 445 n. 29, 107 S.Ct. at 1220 n. 29, 94 L.Ed.2d at 456 n. 29.

**25.** *Chevron U.S.A. Inc. v. NRDC, supra* note 22, 467 U.S. at 842–843 & n. 9, 104 S.Ct. at 2781 & n. 9, 81 L.Ed.2d at 703 & n. 9. See also *NLRB v. United Food & Commercial Workers Union, supra* note 23, 484 U.S. at 123, 108 S.Ct. at 421, 98 L.Ed.2d at 441–442; *INS v. Cardoza–Fonseca, supra* note 23, 480 U.S. at 446–448 & n. 29, 107 S.Ct. at 1220–1221 & n. 29, 94 L.Ed.2d at 456–457 & n. 29.

**26.** *Chevron U.S.A., Inc. v. NRDC, supra* note 22, 467 U.S. at 843, 104 S.Ct. at 2782, 81 L.Ed.2d at 703 (footnote omitted). See also *NLRB v. Unit-*

ed *Food & Commercial Workers Union, supra* note 23, 484 U.S. at 123, 108 S.Ct. at 421, 98 L.Ed.2d at 442; *INS v. Cardoza–Fonseca, supra* note 23, 480 U.S. at 445 n. 29, 107 S.Ct. at 1220 n. 29, 94 L.Ed.2d at 456 n. 29.

**27.** See notes 7–8 *supra.*

**28.** H.R.Rep. No. 741, 86th Cong., 1st Sess. 28 (1959), *reprinted in* [1959] U.S.Code Cong. & Admin.News 2318, 2451.

**29.** S.Rep. No. 187, 86th Cong., 1st Sess. 52 (1959), *reprinted in* [1959] U.S.Code Cong. & Admin.News 2369.

**30.** See H.R.Conf.Rep. No. 1147, 86th Cong., 1st Sess. 31, *reprinted in* [1959] U.S.Code Cong. & Admin.News 2503.

**31.** *Chevron U.S.A. Inc. v. NRDC, supra* note 22, 467 U.S. at 843, 104 S.Ct. at 2782, 81 L.Ed.2d at 703.

**32.** *Id.* at 844, 104 S.Ct. at 2782, 81 L.Ed.2d at 703 (footnote omitted).

entity are conducted independently; (4) whether the operations are financed by the State or other public authority; (5) whether the entity was created by a legislative act; (6) whether the employees of the entity are civil servants subject to regulation by wage scales of the State or other public authority; and (7) whether the entity is exempt from Federal taxation.[33]

■ This methodology is unchallenged; the parties themselves have utilized these criteria freely in their opposing arguments,[34] as did the District Court in concluding that the Center was not a political subdivision of Hawaii.[35] We accept the Secretary's decisional formula as a wholly appropriate exercise of authority to bridge interstices in the legislative scheme.[36] And, after scrutinizing the Secretary's conclusion on the Center's status in light of the formula and the pertinent facts, we cannot say that her construction of the broad statutory term "political subdivision" ·was at all unreasonable.

### IV. CHARACTERISTICS OF THE CENTER

In 1960, "to promote better relations and understanding between the United States and the nations of Asia and the Pacific ... through cooperative study, training, and research," Congress projected the Center as a place "where scholars and students in various fields from the nations of the East and West may study, give and receive training, exchange ideas and views, and conduct other activities primarily in support of the objectives of" other federal laws.[37] Through a series of federal grants-in-aid, the Center was established on the Manoa Campus of the University of Hawaii,[38] and operated by the university from 1960 until 1975.[39] During this period, the Federal Government provided about $95 million for the Center,[40] and Center personnel were state employees.[41]

On July 1, 1975, the Center became an "educational non-profit public corporation" pursuant to a special act of the Hawaii legislature.[42] At the same time, the Department of State and the corporation's board of governors reached agreement on continuing federal grants-in-aid for operation of the Center.[43] The Center's central mission remained unchanged.[44] The incorporating statute provided that "[t]he corporation shall not be considered a department, agency, or public instrumentality of the State, and shall not be subject to the laws of the State applying to departments, agencies and public instrumentalities of the State, except that the corporation shall be subject to all the laws of the State pertaining to non-profit corporations."[45]

From then onward, the board of governors has managed and controlled the Center's affairs.[46] The board consists of eighteen members,[47] at least two of whom are governmental officials. The Governor of Hawaii or his designee is an ex-officio

**33.** U.S. Dep't of Labor, Office of Labor–Management Standards Enforcement, LMRDA Interpretative Manual, § 030.425 [hereinafter Interpretative Manual].

**34.** See Brief for Appellant at 5, 7–12; Brief for Appellee at 6–7, 10.

**35.** *Hawaii Gov't Employees Ass'n, Local 152 v. Martoche, supra* note 3, at 5, J.App. 40.

**36.** See note 31 *supra* and accompanying text.

**37.** 22 U.S.C. § 2054 (1988).

**38.** Statement of Facts, *supra* note 10, ¶ 16, J.App. 8.

**39.** *Id.* ¶ 17, J.App. 8.

**40.** *Id.* ¶ 19, J.App. 9.

**41.** *Id.* ¶ 18, J.App. 9.

**42.** East–West Center Corporation Act, 1975 Haw.Sess.Laws 82, § 4.

**43.** Statement of Facts, *supra* note 10, ¶ 23, J.App. 9.

**44.** *Id.* § 25, J.App. 10.

**45.** East–West Center Corporation Act, 1975 Haw.Sess.Laws 82, § 4. See also *Hawaii Government Employees' Ass'n v. Armbruster*, 5 Haw.App. 158, 681 P.2d 587, 590 (1984) (Center is not a political subdivision).

**46.** Statement of Facts, *supra* note 10, ¶ 26, J.App. 10.

**47.** East–West Center Corporation Act, 1975 Haw.Sess.Laws 82, § 7(a).

member, and the Governor appoints five residents of Hawaii as members.[48] The Assistant Secretary of State for Educational and Cultural Affairs of the Department of State is also an ex-officio member, and the Secretary of State selects five other members.[49] The president of the University of Hawaii is an ex-officio nonvoting member,[50] and the remaining five members are chosen by those who are already members.[51]

The act of incorporation states generally that "the chief executive officer, and its subordinate officers, and other employees and duly authorized representatives of the corporation shall not be considered officers or employees of the State for the purposes of any state law, regulation or executive order."[52] Prior to 1975, employees of the Center were part of a statutorily-defined unit, consisting of University of Hawaii personnel and the state community college system other than faculty, for purposes of collective bargaining.[53] At an election conducted in 1973, Local 152 was certified as the representative of employees in the unit.[54] Local 152 subsequently negotiated a collective bargaining agreement with the state defining the terms and conditions of employment of unit employees, including those at the Center.[55] In their post-incorporation status as private-sector rather than state personnel, Center employees have been fully at liberty to form and join labor organizations, and to bargain collectively through representatives of their own choosing.[56] Local 152 continued as collective bargaining representative of Center employees until June 3, 1985,[57] when that responsibility passed on to another union.[58]

The collective bargaining agreement in effect between 1983 and 1988 erected a salary schedule matching that for federal general schedule positions.[59] The agreement provided that "[a]lthough East–West Center Employees are not Federal Employees, the grade definitions applicable to Federal employees in the GS classification system apply to East–West Center positions in the East–West Center classification system."[60] The agreement further provided that employees in those positions were entitled to cost-of-living allowances at the same rate paid to employees of federal agencies in Hawaii.[61] As we have said, Hawaii does not classify Center employees as state employees,[62] and certainly they are not, in the language of the interpretative manual, "civil servants subject to regulation by wage scales of the State," albeit of those of "other public authority."[63]

Local 152 insists that the degree of state regulation of the Center's activities through its corporate laws militates in favor of a finding that it is a political subdivision of Hawaii.[64] No more than the Secretary does the State of Hawaii think so, nor do we.[65] To be sure, the composition of the

**48.** *Id.* § 7(a)(1).

**49.** *Id.* § 7(a)(2).

**50.** *Id.* § 7(a)(3).

**51.** *Id.* § 7(a)(4).

**52.** *Id.* § 8(f).

**53.** Statement of Facts, *supra* note 10, ¶ 38, J.App. 11.

**54.** *Id.* ¶ 39, J.App. 12.

**55.** *Id.* ¶ 40, J.App. 12.

**56.** *Id.* ¶ 33, J.App. 11.

**57.** See text *supra* at note 11.

**58.** Statement of Facts, *supra* note 10, ¶ 43, J.App. 15.

**59.** *Id.,* J.App. 15.

**60.** *Id.,* J.App. 15.

**61.** *Id.* ¶ 44, J.App. 15.

**62.** See note 52 *supra* and accompanying text.

**63.** Interpretative Manual, *supra* note 33, § 030.425.

**64.** Brief for Appellant at 8–12, 13–16.

**65.** See note 45 *supra* and accompanying text. Local 152 is highly critical of reliance upon state-law characterizations in resolving the political-subdivision issue. We agree that federal law, not state law, governs this determination, *NLRB v. Natural Gas Util. Dist.,* 402 U.S. 600, 602–603, 91 S.Ct. 1746, 1748, 29 L.Ed.2d 206, 209 (1971), but we see nothing wrong with giving state-law declarations and interpretations

board of governors is conducive to a measure of public oversight, but there is nothing to indicate that the Center has ever been subjected to any state-mandated agenda.[66] Rather, the act of incorporation makes it crystal clear that the Center's activities are to be confined to those subserving the educational and cultural objectives set by Congress in 1960.[67] The Center is located on the campus of the University of Hawaii, a state-owned and -operated facility, and it cannot obtain more land from the university without legislative approval,[68] or further develop the properties it occupies without consent of the university,[69] but these two restrictions are hardly unique in what essentially is a landowner-tenant relationship. The act of incorporation requires the Center to publish a report annually,[70] but Hawaii law summons all private corporations to file an "annual exhibit." [71] The Center is endowed only with the powers of a Hawaiian private corporation;[72] aside from promotion of educational and cultural interchange, it offers no service that could be associated with a state political subdivision; and it has no authority whatsoever to regulate the conduct of those who do not voluntarily enter

its program.[73] The impact of state-law regulation on the everyday conduct of Center affairs is thus minimal, and not significantly different or greater than that which countless other private corporations take in stride.

Local 152's remaining arguments are equally infirm. It calls attention to the fact that the great bulk of the Center's operations are financed by governmental funding, one of the circumstances listed for consideration in the interpretative manual.[74] We are unable, however, to comprehend how this factor could plausibly support the conclusion that the Center is a state political subdivision.[75] Income generated by the Center is exempt from federal, state and local taxation,[76] but hardly could any great significance be attached to this, for exemptions of that sort are shared by many nonprofit entities which nobody would characterize as political subdivisions of any state.[77] In sum, the circumstances pressed by Local 152, whether viewed singly or combinationally, do not warrant abandonment of the Secretary's assessment of their overall effect.

---

"careful consideration" so long as they do not assume "controlling importance." *Id.*

**66.** See *Hawaii Gov't Employees Ass'n v. Martoche, supra* note 3, at 3, J.App. 38. That would seem to be unlikely since the number of seats on the governing body under the control of state officials is decidedly a minority. See text *supra* at notes 47–51.

**67.** East–West Center Corporation Act, 1975 Haw.Sess.Laws 82, § 5.

**68.** *Id.* § 16; Statement of Facts, *supra* note 10, ¶ 34, J.App. 11.

**69.** East–West Center Corporation Act, 1975 Haw.Sess.Laws 82, § 16; Statement of Facts, *supra* note 10, ¶ 35, J.App. 11.

**70.** East–West Center Corporation Act, 1975 Haw.Sess.Laws 82, § 12(b).

**71.** Haw.Rev.Stat. § 416–95 (1985).

**72.** See East–West Center Corporation Act, 1975 Haw.Sess.Laws 82, § 6 (powers and duties of the corporation).

**73.** The Center is very different from the transit authority in *Rose v. Long Island R.R. Pension Plan,* 828 F.2d 910, 915 (2d Cir.1987), *cert. de-*

*nied,* 485 U.S. 936, 108 S.Ct. 1112, 99 L.Ed.2d 273 (1988), which was held to be a political subdivision primarily because it possessed the right of eminent domain and police-type power to promulgate regulations preempting local ordinances and controlling passengers' conduct.

**74.** See text *supra* at note 40.

**75.** During 1986, the Center received more than $20 million in federal funds, more than $1 million from foreign nations and more than $1.8 million from private donors, primarily foundations. During that year, the State of Hawaii allocated $25,000. Statement of Facts, *supra* note 10, ¶ 46, J.App. 15–16. See *Philadelphia Nat'l Bank v. United States,* 666 F.2d 834 (3d Cir.1981), holding that Temple University was not a political subdivision within the meaning of the Internal Revenue Code, notwithstanding the fact that the State of Pennsylvania's annual appropriation to Temple over a period of years represented more than half of the university's unrestricted revenue of the institution.

**76.** Statement of Facts, *supra* note 10, ¶ 45, J.App. 15.

**77.** See, e.g., 26 U.S.C. § 501 (1988).

Local 152 also contends that because the Center exhibits in varying degrees some—the union says all seven [78] — of the characteristics enumerated in the interpretative manual, it must be deemed a political subdivision of Hawaii.[79] We reject this argument because the manual sets forth, not a test for political-subdivision status, but only guidelines that may be useful in making the determination one way or the other. The Secretary has declared that "[w]hether a particular entity is a 'political subdivision' of a State depends upon the facts of each case," [80] and has set forth some, but plainly not all, of "the factors that may be considered" in ascertaining whether the entity is or not.[81] That is not a suggestion, and much less a requirement, that the entity must lack each and every one of the characteristics enumerated lest it be classified as a state political subdivision.

## V.  ADDITIONAL CONSIDERATIONS

Local 152 founds much of its thesis upon the Supreme Court's opinion in *NLRB v. Natural Gas Utility District.*[82] We think its reliance upon that decision is badly misplaced. In that case, the District resisted an order of the National Labor Relations Board calling for a representation election among the pipefitters it employed, and later a cease-and-desist order emanating from an unfair labor practice proceeding under the Labor Management Relations Act,[83] solely on the ground that it was a "political subdivision" of Tennessee, and as such not an "employer" subject to the Board's jurisdiction.[84] The District had been organized for the purpose of distributing natural gas within a specified portion of a county, and it possessed not only all of the authority of a private corporation but also " 'all of the powers necessary and requisite for the accomplishment of the purpose for which [it was] created, capable of being delegated by the legislature.' " [85] Because the text of the LMRA and its legislative history had left the thrust of the term "political subdivision" uncertain, the Board customarily had limited the political-subdivision exemption to two classes of entities, one of which consisted of those "administered by individuals who are responsible to public officials or to the general electorate." [86] The Board held that the District was "an essentially private venture," [87] but the Supreme Court, upon an examination of the totality of relevant facts, found that the Board's outcome was plainly at war with its own test.[88]

To begin with, *Natural Gas Utility District* is factually distinguishable from the case at bar in a variety of ways. The District statutorily was "a municipality" or "public corporation in perpetuity," and "a body politic and corporate with power of perpetual succession." [89] The District had the power of eminent domain, which it could exercise even against other governmental entities,[90] and all delegable powers needed for accomplishment of the purpose to which it owed its existence.[91] The District's records were "public records," as

78.  Brief for Appellant at 8–12.

79.  Brief for Appellant at 7–12.

80.  See text *supra* at note 33.

81.  See text *supra* at note 33.

82.  *Supra* note 65.

83.  Act of June 23, 1947, ch. 120, 61 Stat. 136 (codified as amended at 29 U.S.C. §§ 141–187 (1988)).

84.  402 U.S. at 601, 91 S.Ct. at 1748, 29 L.Ed.2d at 208.  See 29 U.S.C. § 152(2) (1988).

85.  402 U.S. at 606, 91 S.Ct. at 1750, 29 L.Ed.2d at 211 (quoting Tenn.Code Ann. § 6–2612 (1955)).

86.  402 U.S. at 604–605, 91 S.Ct. at 1749, 29 L.Ed.2d at 210.

87.  *Id.* at 605, 91 S.Ct. at 1750, 29 L.Ed.2d at 210.

88.  *Id.* at 605, 91 S.Ct. at 1749–1750, 29 L.Ed.2d at 210.

89.  *Id.* at 606, 91 S.Ct. at 1750, 29 L.Ed.2d at 211 (using the terminology of Tenn.Code Ann. § 6–2607 (Supp.1988)).

90.  *Id.* at 608, 91 S.Ct. at 1751, 29 L.Ed.2d at 211–212.

91.  *Id.* at 606, 91 S.Ct. at 1750, 29 L.Ed.2d at 211 (referring to Tenn.Code Ann. § 6–2612 (1955)).

such open to public inspection.[92] The District was required to prepare and publish in a newspaper of general circulation its annual statement showing its financial condition, earnings and method of setting rates.[93] The District's commissioners had to hear protests to its rates at public hearings, and publish written findings as to their reasonableness.[94] The commissioners' determinations were judicially reviewable.[95]

To the Court these differences were important. The right of eminent domain "weigh[ed] in favor of finding the entity to be a political subdivision."[96] The "extremely broad grant of" powers to the District spoke for itself.[97] And "[t]he District's 'public records' requirement and the automatic right to a public hearing and written 'decision' by the commissioners accorded to all users betoken[ed] a state, rather than a private, instrumentality."[98] Additionally, "[t]he commissioners' power of subpoena and their nominal compensation further suggest[ed] the public character of the District."[99]

Of even greater importance in *Natural Gas Utility District* was the statutory methodology of appointing and removing District commissioners. They were initially appointed, from nominees in a petition for establishment of a district, by the county judge, an elected public official.[100] The commissioners served four-year terms and were removable from office for misfeasance or nonfeasance.[101] In the event of a vacancy, the county judge appointed a new commissioner if the remaining two commissioners could not agree upon a replacement;[102] in large counties, vacancies were filled by popular election.[103] "Plainly," the Court said, "commissioners who are beholden to an elected public official for their appointment, and are subject to removal procedures applicable to all public officials, qualify as 'individuals who are responsible to public officials or to the general electorate' within the Board's test."[104] The District therefore was "an entity 'administered by individuals [the commissioners] who are responsible to public officers [an elected county judge],' and this together with the other factors mentioned"[105] convinced the Court "that its relationship to the State is such that" the District "is a 'political subdivision' within the meaning of" the LMRA.[106]

We are satisfied that *Natural Gas Utility District* is not controlling here. The facts of that case differ in critical respects. The Board's standard for determining whether an entity is a political subdivision differed materially from the Secretary's.[107] There the question was whether the Board had honored its own test; here the issue is whether the Secretary reached a factual conclusion clearly unsupportable by reason.

92. 402 U.S. at 607, 91 S.Ct. at 1750, 29 L.Ed.2d at 211 (citing Tenn.Code Ann. § 6–2615 (Supp. 1970)).

93. *Id.* (citing Tenn.Code Ann. § 6–2617 (Supp. 1970)).

94. *Id.* (citing Tenn.Code Ann. § 6–2618 (1955)).

95. 402 U.S. at 607, 91 S.Ct. at 1750–1751, 29 L.Ed.2d at 211 (citing Tenn.Code Ann. § 6–2618 (1955)).

96. *Id.* at 608, 91 S.Ct. at 1751, 29 L.Ed.2d at 212 (citation omitted).

97. See *id.*, 91 S.Ct. at 1751, 29 L.Ed.2d at 212.

98. *Id.*, 91 S.Ct. at 1751, 29 L.Ed.2d at 212.

99. *Id.*, 91 S.Ct. at 1751, 29 L.Ed.2d at 212.

100. *Id.* at 607, 91 S.Ct. at 1751, 29 L.Ed.2d at 211 (citing Tenn.Code Ann. § 6–2604 (Supp.1970)).

101. *Id.* (citing Tenn.Code Ann. § 8–2701 *et seq.* (1955); *First Suburban Water Utility District v. McCanless,* 177 Tenn. 128, 138, 146 S.W.2d 948, 952 (1941).

102. 402 U.S. at 608, 91 S.Ct. at 1751, 29 L.Ed.2d at 211 (citing Tenn.Code Ann. § 6–2614 (Supp. 1970)).

103. *Id.* (citing same).

104. *Id.* at 608, 91 S.Ct. at 1751, 29 L.Ed.2d at 212. See text *supra* at note 86.

105. *Id.* at 609, 91 S.Ct. at 1751, 29 L.Ed.2d at 212 (bracketed materials in original).

106. *Id.*

107. Compare text *supra* at note 33 with text *supra* at note 86.

The District had all of the public-utility powers it needed; the Center has no appreciably greater power than any other Hawaiian nonprofit corporation.[108] Very importantly, the Board disregarded an array of facts reflecting indicia of truly governmental activity, and its decision was in the teeth of its own test. Here there is no indication of abnormal governmental involvement in the Center's activities, and the Secretary's conclusion was faithful to the criteria set forth in his interpretative manual.

■ Local 152 advances one more contention. In 1980, it filed with the National Labor Relations Board a complaint invoking the Labor Management Relations Act with respect to a charge that the Center had violated the National Labor Relations Act. The Board refused to exercise jurisdiction, however, on the ground that the Center was not an employer over which the Board could assert its authority.[109] The argument is that we should reach a similar conclusion here [110] because both the LMRA and the Labor Management Reporting and Disclosure Act in identical language exclude political subdivisions from the definition of "employer." [111] We perceive no error or injustice in binding Local 152 to the records-production requirement of the LMRDA while the Center remains free of regulation under the LMRA. As the Third Circuit wrote in the context of resolving Temple University's status under the Internal Revenue Code,

> [t]hat an entity may have some governmental characteristics for certain purposes does not necessarily control its status under a different statutory scheme.... Thus the fact that the NLRB declined to exercise jurisdiction over a labor matter at Temple because of its unique relationship with the state is not determinative.[112]

We are in full agreement with that proposition and its applicability here.

The judgment of the District Court is accordingly

*Affirmed.*

---

**108.** See East–West Center Corporation Act, 1975 Haw.Sess.Laws 82, §§ 4–6.

**109.** Letter from Robert M. Miller, Acting Regional Director, NLRB, to Jeffrey S. Harris, Counsel for Local 21, Feb. 2, 1981, J.App. 35.

**110.** Brief for Appellant at 19–21.

**111.** Compare 29 U.S.C. § 152(2) (1988) with *id.* § 402(e) (quoted *supra* note 8).

**112.** *Philadelphia Nat'l Bank v. United States, supra* note 75, 666 F.2d at 839 (citing authorities).